DECISION AND JOURNAL ENTRY
Appellant Robert Bender appeals an order of the Summit County Court of Common Pleas, Juvenile Division, that granted permanent custody of his daughter, Kalli Reeves, to Summit County Children Services Board ("CSB"). We affirm.
Kalli was born on December 1, 1994, to Karen Reeves. At the time of Kalli's birth, Appellant was in prison. In 1996, after his release from prison, a restraining order was issued against Appellant, prohibiting him from having contact with Kalli. He also was obligated to pay $215.38 per month in child support for Kalli.
On August 27, 1997, the juvenile court granted a motion by CSB for emergency temporary custody of Kalli and her three brothers. At an adjudicatory hearing before a magistrate on October 31, 1997, Appellant, represented by appointed counsel, expressed a desire for genetic testing to determine whether he was the father of Kalli. He also stated that he did not want to be part of a case plan and that he wanted to waive his parental rights to Kalli. After a colloquy, the magistrate determined that Appellant's waiver was voluntary, knowing, and intelligent but reminded Appellant that he had a right to counsel and to participate in the proceedings at any stage. Kalli and her brothers were found to be dependent on December 5, 1997.
CSB moved for permanent custody on November 9, 1998. Thereafter, Appellant expressed a desire to gain custody of Kalli. A case plan was established, and Appellant received visitation rights for one hour a week.
A hearing on the motion for permanent custody was held in early 1999. As to Kalli, the juvenile court found that Appellant had not received sufficient notice under due process and denied the motion for permanent custody of Kalli.[1]
A new case plan for Appellant was made on May 11, 1999. As subsequently amended, the case plan set the following objectives for Appellant: (1) establish paternity of Kalli through genetic testing; (2) take parenting education courses; (3) demonstrate appropriate parenting skills through monitored visitation with Kalli; (4) maintain adequate housing; (5) with his wife, submit to psychological assessments; and (6) comply with child support orders, including the payment of all arrearages.
On August 19, 1999, CSB moved for permanent custody of Kalli and a recently-born sister, Morgan. A hearing was held on October 28-29, 1999, and February 10-12, 2000. Several health professionals, CSB employees, and the foster mother testified for CSB. Appellant presented his own testimony as well as that of his wife, Deborah Bender, and his wife's mother. The juvenile court called the guardian ad litem as a witness.
The juvenile court issued its decision on March 21, 2000. In the decision, the juvenile court found by clear and convincing evidence that placement with CSB was in Kalli's best interest and that she should not be placed with Karen Reeves or Appellant. Accordingly, CSB's motion for permanent custody of Kalli was granted.[2] Appellant timely appealed to this court.
Appellant presents five assignments of error, which are addressed together in his brief to this court. The essential issues before us are whether the trial court's decision is supported by clear and convincing evidence and by the manifest weight of the evidence. Because Appellant addresses the arguments together, we shall do likewise.
R.C. 2151.414(B) states that a juvenile court may grant permanent custody of a child to an agency such as CSB if two conditions are met. First, the trial court must find that granting permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). Second, the trial court must find that "[t]he child is not abandoned or orphaned and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents[,]" R.C. 2151.414(B)(1), based on an analysis under R.C. 2151.414(E). These findings must be supported by clear and convincing evidence. R.C. 2151.414(B). The appropriate standard of review is whether the juvenile court, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. In re James (Oct. 14, 1998), Summit App. No. 18936, unreported, at 6.
In determining the best interest of the child, R.C. 2151.414(D)[3]
requires the trial court to consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition issued under section 2151.353 or 2151.415 of the Revised Code for twelve or more months of a consecutive twenty-two month period ending on or after the effective date of this amendment [March 18, 1999];
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child.
Under R.C. 2151.414(E), if a juvenile court makes one of sixteen enumerated findings, then the court must find that the child cannot be placed with either parent within a reasonable time or that the child should not be placed with either parent. In the case at bar, the juvenile court found the following R.C. 2151.414(E) factors to be relevant:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]
 Having reviewed the applicable legal standards, we turn to a review of the relevant evidence.
Dr. Patricia Seifert is a psychologist with Northeast Ohio Psychological Associates. Dr. Seifert performed psychological tests on Appellant and his wife, Deborah Bender ("Deborah"). She testified that Appellant was pleasant and able to express himself, and that there was no evidence of a major psychological disorder. During the three sessions with Appellant and Deborah, Dr. Seifert asked for a copy of the case plan, which Appellant forgot to bring each time. On the date of the last session, Appellant arrived but had to return home to retrieve the case plan. Dr. Seifert testified that this was a concern to her because it was an indication of his ability to remember.
Appellant and Deborah completed several psychological tests. Appellant's IQ score was 77, within the borderline range of intelligence but still allowing him to function in the world; Deborah's IQ was 88. Appellant successfully completed a parenting test that measured his understanding of when developmental milestones for children should occur. He failed to complete twenty-nine of forty questions on the Rotter Incomplete Sentence Blank test. The results of the MMPI-2 test did not indicate any psychopathology but showed that Appellant had a preoccupation with physical functioning. The testing also indicated that Appellant had difficulty with his memory and with his ability to plan ahead, which would be crucial for Kalli's development. The household of Appellant and Deborah consisted of themselves and two or three of Deborah's adult children, one of whom also had developmental issues. Deborah told Dr. Seifert that Appellant had no patience and a short temper. Dr. Seifert concluded that, based on what she learned about Kalli's special needs, Appellant would have difficulty raising Kalli. Dr. Seifert did agree that Appellant expressed a desire to utilize whatever professional assistance he or Kalli required to continue her development.
Dr. Robin Tener is the clinical director of Northeast Ohio Psychological Associates. Dr. Tener conducted an evaluation of Kalli's developmental and other problems. Dr. Tener testified that Kalli had a borderline IQ and that her speech and language development was more like that of a three and a half year old child, rather than a five year old child. Kalli was also diagnosed as having reactive attachment disorder, disinhibited type. Dr. Tener testified that a person with this disorder will show attention to whoever will show attention to her, including strangers, until the other person acts in a manner contrary to her wishes. A person with reactive attachment disorder does not form a lasting bond with any particular person, including a parent, meaning that the caregiver must understand that he or she will give far more in the relationship than the person with the disorder. Such a person does not internalize values, is self-centered and without empathy for the feelings of others, and does not realize a sense of self-worth. Kalli was also diagnosed as having attention deficit/ hyperactivity disorder.
Dr. Tener testified as to the kind of environment Kalli would need in order to progress. Dr. Tener stated that reactive attachment disorder is difficult to treat and requires a great deal of commitment from the caregiver. Kalli's caregiver must give a very structured and well-supervised environment. Dr. Tener testified that there were concerns about Appellant's ability to raise Kalli, because of an unstructured environment in the home, because he only recognized the speech and language deficits and the hyperactivity, and because Appellant would have to rely on the help of Deborah, who had frequent health problems and was receiving Social Security for disability. On cross-examination, Dr. Tener stated that the foster mother had been given some assistance in dealing with Kalli's disorder but that Appellant had not received such assistance. Dr. Tener also testified that Appellant had indicated a willingness to cooperate in Kalli's future therapy.
Martha Bender ("Ms. Bender") is a social worker with the Child Guidance Center. She was assigned as Kalli's therapist and also had contact with Appellant and Deborah. Ms. Bender testified that she also diagnosed Kalli was having reactive attachment disorder, disinhibited type, attention deficit/hyperactivity disorder, and speech disorder. Ms. Bender met with Kalli's foster mother often and found the foster mother to be a very patient and calm person. When asked who she wanted to live with, Kalli indicated on more than one occasion that she wanted to live with her foster mother.
Ms. Bender met with Appellant and Deborah on one occasion and attempted to express the severity of Kalli's disorder. After the meeting, Ms. Bender felt that they did not understand the difficulty that raising Kalli would present in the future. She testified that Kalli's caregiver had to have an unusual amount of patience and a willingness to repeat instructions and that the household would have to be extremely structured. On cross-examination, Ms. Bender stated that Appellant showed a willingness to follow through with Kalli's therapy and that he had not received the level of support that the foster mother did with regard to understanding Kalli's disorder.
David Darulis is a supervisor with the Summit County Child Support Enforcement Agency. He testified that as of January 21, 2000, Appellant had accrued arrearages of $12,191.26 on his obligation for Kalli. Appellant's total payments on the child support for Kalli amounted to $1,320.86, and the last payment was made on February 17, 1998. Appellant also owed child support on two other minor children, totaling almost $8,000.
Lynda Mitchell is the foster mother for Kalli and for Kalli's younger sister Morgan and their brother Jonathan.[4] Also living in the household were Mitchell's husband and their three children, ages twelve, eight, and six. Mitchell testified that when she came into her care, Kalli could only say one or two words at a time. She would warm up to strangers, call people who were not her parents "mommy" or "daddy," and take toys from other children. Since coming into Mitchell's care, Kalli participated in speech therapy, which greatly improved her ability to speak, and has also become more wary of strangers. Kalli has become very close to Mitchell's daughter Amanda. Mitchell testified that, in her opinion, Kalli was attached to her, as well as to her siblings (Morgan and Jonathan) and Mitchell's daughter Amanda. She also stated that Kalli looked forward to her visits with Appellant but that she did not experience any difficulty in separating from him after the visits ended.
Deborah Brewster ("Ms. Brewster") works for CSB as a protective services case worker. She became involved as the caseworker for Kalli in October 1999. During that time, she monitored Appellant's visits with Kalli. Ms. Brewster testified that Appellant took a passive role during the visits, and his wife Deborah took an active role. Ms. Brewster was of the opinion that during those visits, Appellant did not always demonstrate good parenting skills. While observing a visit at a McDonald's restaurant, Ms. Brewster observed Kalli become frustrated and say, "I want Mommy Lynda [Lynda Mitchell]." Ms. Brewster testified that Appellant did not seek custody of Kalli until after his marriage to Deborah. Ms. Brewster believed that Kalli should be placed in the permanent custody of CSB based on her significant special needs and the necessity of prolonged and intense therapy in the future. She did not believe that Appellant would follow through on such matters.
Helen Litten is the mother of Appellant's wife Deborah. She testified that Appellant took an active role in his visits with Kalli and that he sincerely wanted to have Kalli live with him.
Deborah Bender married Appellant in February 1998. She testified that she was receiving disability payments as a result of her asthma. Deborah stated that Appellant took an active role in their visits with Kalli and that he disciplined her when necessary. She conceded on cross-examination that Appellant occasionally loses his patience and has what she termed "spells," when he became "like a stranger." Deborah agreed that Kalli had speech and hyperactivity problems, but when asked whether she believed that Kalli had reactive attachment disorder, Deborah stated that she had not observed the behaviors associated with the disorder but that Kalli "might" have the disorder. She also testified that she and Appellant were beginning to receive training on how to deal with a child with that disorder.
Appellant testified that he participated and received a certificate from a parenting class. Appellant recognized Kalli's speech and attention deficit/hyperactivity disorders. He stated that he did not believe that Kalli had reactive attachment disorder, because he did not observe any of the manifestations mentioned by the psychologists, but that he was willing to help her with her therapy and to follow through with her treatment for the disorder. He reiterated that he and Deborah were being taught by a mental health agency how to address the disorder and expressed displeasure at CSB's apparent unwillingness to assist him in receiving that training while the foster mother did receive such support. Appellant had convictions for attempted abduction, violating temporary protective orders, and interfering with custody.
The guardian ad litem testified as a witness of the juvenile court and essentially reiterated the testimony of CSB's witnesses. She stated in her opinion that it was in Kalli's best interest that permanent custody be granted to CSB.
We conclude that the juvenile court's finding that Kalli could not or should not be placed with Appellant, pursuant to R.C. 2151.414(E), was not against the manifest weight of the evidence. Appellant demonstrated a lack of commitment toward Kalli by failing to regularly support her when he persistently failed to pay child support, even when his case plan called for him to do so. See R.C. 2151.414(E)(4). Appellant also failed continuously and repeatedly to remedy the conditions that caused Kalli's placement outside the home, as found in the case plan. See R.C.2151.414(E)(1). Appellant did establish paternity, as required by the case plan. However, he failed to pay child support under the case plan. CSB's witnesses were skeptical of the quality of the parenting class that Appellant took and of the extent to which he demonstrated appropriate parenting skills. Furthermore, while Appellant stated that he was willing to help Kalli with her therapy for her reactive attachment disorder, he would not acknowledge that she did have the disorder. A reasonable factfinder could conclude that Appellant was not fully committed to continuing Kalli's therapy.
We also conclude that the juvenile court's finding that permanent custody was in Kalli's best interest was not against the manifest weight of the evidence. Kalli showed some attachment to her foster mother and foster sister and to her natural brother and sister, but no truly enduring attachment to Appellant or his wife. R.C. 2151.414(D)(1). Kalli had been in the temporary custody of CSB for a significant period of time (from August 1997 to March 2000), longer than the time period required by R.C. 2151.414(D)(3). The evidence also appeared to demonstrate that a secure placement was needed and that placement with Appellant would not achieve that goal. R.C. 2151.414(D)(4).
The juvenile court's order granting permanent custody of Kalli to CSB was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Accordingly, Appellant's five assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ________________________ LYNN C. SLABY
FOR THE COURT, WHITMORE, J., CONCURS.
CARR, J, CONCURS IN JUDGMENT ONLY.
[1] The juvenile court granted the motion as to all other children, and this court affirmed the juvenile court's disposition. In reReeves/Carmichael (June 7, 2000), Summit App. Nos. 19650/19669/19672/19673/ 19674/19705/19706/19707, unreported.
[2] The juvenile court also granted permanent custody of Kalli's sister, Morgan.
[3] We apply the version of R.C. 2151.414 in effect on August 19, 1999, the date that the motion for permanent custody was filed. See Inre Farris (Oct. 18, 2000), Summit App. No. 20102, unreported, at 6.
[4] Jonathan was one of the other children involved in In reReeves/Carmichael, supra.